KRAUSE, Circuit Judge.
 

 In
 
 Vanderklok v. United States
 
 ,
 
 868 F.3d 189
 
 (3d Cir. 2017), we declined to imply a
 
 Bivens
 
 cause of action against airport screeners employed by the Transportation Security Administration (TSA) in part because they "typically are not law enforcement officers and do not act as such."
 

 Id.
 

 at 208
 
 . We now must decide a related question that we anticipated, but did not resolve, in
 
 Vanderklok
 
 : whether TSA screeners are "investigative or law enforcement officers" under the Federal Tort Claims Act (FTCA).
 

 This question, one of first impression among the Courts of Appeals, arises because Appellant Nadine Pellegrino has asserted intentional tort claims against TSA screeners. Although under the FTCA the United States generally enjoys sovereign immunity for intentional torts committed by federal employees, this rule is subject to an exception known as the "law enforcement proviso," which waives immunity for a subset of intentional torts committed by employees who qualify as "investigative or law enforcement officers."
 
 28 U.S.C. § 2680
 
 (h). Pellegrino's claims may proceed only if TSA screeners fall into this category.
 

 Based on our review of the statute's text, purpose, and legislative history, as well as precedent from this Court and other Courts of Appeals, we now reach the conclusion that we foreshadowed in
 
 Vanderklok
 
 and hold that TSA screeners are not "investigative or law enforcement officers" under the law enforcement proviso. Pellegrino's claims are therefore barred by the Government's sovereign immunity, and we will affirm the District Court's judgment dismissing this action.
 

 I. Facts and Procedural History
 

 A. Airport Security and Screeners
 

 To place what follows in proper context, we briefly describe the structure of the TSA and the screeners' place within that structure. Congress created the TSA in the aftermath of the terrorist attacks of September 11, 2001, with the enactment of the Aviation and Transportation Security Act (ATSA), Pub. L. No. 107-71,
 
 115 Stat. 597
 
 (2001). The head of the TSA is the Under Secretary of Transportation for Security,
 
 49 U.S.C. § 114
 
 (b), who is responsible for security in all modes of transportation, including civil aviation,
 

 id.
 

 § 114(d).
 

 Pertinent here is the Under Secretary's responsibility to "provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation."
 

 Id.
 

 § 44901(a). With exceptions not relevant here, this screening is required to be performed "by a Federal Government employee."
 

 Id.
 

 These employees were referred to as "screeners" at the time of the ATSA's enactment but were reclassified as "Transportation Security Officers" (TSOs) in 2005 as part of an effort to improve morale and combat employee-retention problems.
 
 The Transportation Security Administration's Airline Passenger and Baggage Screening: Hearing Before the S. Comm. on Commerce, Sci., & Transp.
 
 , 109th Cong. 7 (2006) [hereinafter
 
 Screening Hearing
 
 ] (statement of Edmund "Kip" Hawley, Assistant Secretary, Transportation Security Administration).
 
 [1]
 
 In 2016, the TSA screened more than 2 million passengers per day.
 
 See
 
 Bob Burns,
 
 TSA Year in Review
 
 , Transp. Sec. Admin. (Jan. 12, 2017), https://www.tsa.gov/blog/2017/01/12/tsa-year-review-record-amount-firearms-discovered-2016.
 

 TSOs form just one part of the airport-security apparatus. The Under Secretary may also designate employees to serve as "law enforcement officer[s]."
 
 49 U.S.C. § 114
 
 (p)(1). An employee so designated may carry a firearm, make arrests, and seek and execute warrants for arrest or seizure of evidence.
 

 Id.
 

 § 114(p)(2). The Under Secretary is required to deploy law enforcement personnel at each screening location; typically, at least one such law enforcement officer must be at each location.
 

 Id.
 

 § 44901(h)(1)-(2). Screening locations are thus staffed by both TSOs and law enforcement officers.
 

 B. Factual Background
 

 [2]
 

 In 2006, Pellegrino and her husband, Harry Waldman, arrived at the Philadelphia International Airport, where they planned to catch a flight home to Florida. Pellegrino brought three bags to the security checkpoint: a rolling tote, a larger rolling bag that would fit in the overhead compartment of the airplane, and a small black canvas bag. After Pellegrino passed through a metal detector, a TSO directed her to step aside for further screening. A few minutes later, TSO Thomas Clemmons arrived and began to search Pellegrino's bags, but because Pellegrino believed that Clemmons was treating neither her nor her bags respectfully, she asked for a private screening. According to Pellegrino, Clemmons then "walked off with a very
 arrogant, negative, hostile attitude," Pellegrino Dep. 85:24-86:2, D.Ct. Dkt. No. 156, and TSO Nuyriah Abdul-Malik came to perform the screening in Clemmons's stead.
 

 As Abdul-Malik prepared to search Pellegrino's bags, Pellegrino "had the distinct feeling" that Abdul-Malik's gloves were not clean and asked her to put on new ones. Pellegrino Dep. 90:18-22, D.Ct. Dkt. No. 156. Abdul-Malik did as Pellegrino asked, but Pellegrino asserts that this request engendered hostility from Abdul-Malik. Abdul-Malik and Pellegrino then proceeded to a private screening room, where they were joined by TSA employees Laura Labbee, a supervisory TSO, and Denise Kissinger, another TSO.
 
 [3]
 
 Kissinger swabbed Pellegrino's shirt and left the room to test the sample (for the presence of explosives), while Abdul-Malik inspected Pellegrino's luggage. Pellegrino contends that Abdul-Malik's screening was unnecessarily rough and invasive-extending to her credit cards, coins, cell phone, and lipstick.
 

 At some point, Pellegrino asked Labbee why she was being subjected to this screening, and Labbee responded that it was an "airline-designated search." Pellegrino Dep. 104:12, D.Ct. Dkt. No. 156. Pellegrino took this to mean that her airline ticket had been marked in a way that prompted the search, and because she and Waldman had accidentally switched tickets, she sought to stop the search by explaining that she believed that Waldman should have been searched instead. Nevertheless, the search continued, and Pellegrino told Labbee that she was going to report her to TSA authorities.
 

 Once Abdul-Malik finished searching the rolling tote, Pellegrino, who believed that Abdul-Malik had damaged her eyeglasses and jewelry, asked Abdul-Malik to leave her items outside the tote so that Pellegrino could re-pack it herself. Abdul-Malik refused and the interaction continued to deteriorate. First, Abdul-Malik had trouble zipping the tote closed and had to press her knee into it to force it shut. Next, when Pellegrino asked Labbee for permission to examine the tote, which she believed Abdul-Malik had damaged, that request was also denied. Pellegrino then told Labbee and Abdul-Malik they were "behaving like bitches." Pellegrino Dep. 114:13-14, D.Ct. Dkt. No. 156. Finally, after Abdul-Malik had searched Pellegrino's largest bag, which contained clothes and shoes, and Kissinger finished swabbing and testing, Pellegrino was told that she could leave.
 

 But simple closure was not to be. Instead, Pellegrino saw that Abdul-Malik had not re-packed her shoes, asked if she intended to do so, and was told "no." Pellegrino Dep. 122:2, D.Ct. Dkt. No. 156. At that point, intending to re-pack her bags outside of the screening room, Pellegrino tossed her shoes through the open door toward the screening lanes and began to carry her largest bag out of the room. In the process, according to Labbee and Kissinger, she struck Labbee in the stomach with the bottom of the bag. When Pellegrino then returned to the screening room for her smaller rolling tote, Abdul-Malik allegedly stood in her way, forcing her to crawl on the floor under a table to retrieve it. According to the TSOs, Pellegrino then struck Abdul-Malik in the leg with this bag as she was removing it. Although Pellegrino denied (and has consistently denied) that either bag touched either TSO, Labbee
 and Abdul-Malik immediately went to the supervisor's station to press charges against Pellegrino.
 

 Philadelphia police officers arrived at the scene a short time later, arrested Pellegrino, and took her to the police station, where she was held for about 18 hours before being released on bond. Eventually, the Philadelphia District Attorney's Office filed ten charges against Pellegrino: two counts each of felony aggravated assault,
 
 see
 

 18 Pa. Cons. Stat. § 2702
 
 ; possession of instruments of a crime,
 
 see
 
 id.
 

 § 907; reckless endangerment,
 
 see
 
 id.
 

 § 2705; simple assault,
 
 see
 
 id.
 

 § 2701; and making terroristic threats,
 
 see
 
 id.
 

 § 2706.
 

 By the time the matter proceeded to trial in Philadelphia Municipal Court, however, Abdul-Malik was no longer employed by the TSA and did not appear. And because the trial judge had ruled that no witnesses could testify about events that took place outside of the private screening room in the absence of footage from video surveillance, Labbee-who was positioned partially outside the door of the screening room during the alleged assault-was precluded from testifying to those events. Without that testimony, the trial judge entered a verdict of not guilty.
 

 In July 2008, Pellegrino submitted a claim to the TSA concerning the TSOs' alleged misconduct and requesting damages of $951,200. The TSA denied the claim by letter almost a year later.
 

 C. Procedural Background
 

 In November 2009, Pellegrino and Waldman
 
 [4]
 
 commenced this civil rights action in the Eastern District of Pennsylvania, naming as defendants the United States, the TSA, Abdul-Malik, Labbee, and Kissinger, and raising FTCA claims as to all defendants for (a) property damage, (b) false arrest/false imprisonment, (c) malicious prosecution, (d) civil conspiracy, (e) defamation, and (f) intentional and negligent infliction of emotional distress. In addition, as to the individual defendants, they raised
 
 Bivens
 
 claims for malicious and retaliatory prosecution, "aiding and abetting" malicious prosecution, and conspiracy to deprive civil rights, as well as a conspiracy claim under
 
 42 U.S.C. § 1985
 
 (3). As to the TSA alone, they raised claims for failing to investigate their civil rights complaint in violation of the Administrative Procedure Act (APA) and failing to comply with requests for information under the Freedom of Information Act (FOIA) and the Privacy Act.
 

 In a series of orders, the District Court denied relief to Pellegrino on all claims with the exception of one FTCA property damage claim that the parties settled. In this appeal, we focus primarily on Pellegrino's FTCA claims for the intentional torts of false arrest, false imprisonment, and malicious prosecution.
 
 [5]
 

 The District Court granted summary judgment on those claims on the ground that TSA screeners are not covered by the FTCA's law enforcement proviso because they are not "empowered by law to execute searches ... for violations of Federal law."
 

 Pellegrino v. U.S. Transp. Sec. Admin.
 
 , No. 09-5505,
 
 2014 WL 1489939
 
 , at *5, *8 (E.D. Pa. Apr. 16, 2014). While the Court recognized that TSA screeners are permitted to perform something that qualifies as a "search" under the Fourth Amendment, it concluded that it was unclear whether "Congress intended 'search' in § 2680(h) to be synonymous with 'search' within the meaning of the Fourth Amendment."
 
 Id.
 
 at *5. Because it found the language of the proviso ambiguous, the Court turned to legislative history. The Court observed that "[a] review of the legislative history reveals that Congress, in response to 'no-knock' raids conducted by federal narcotic agents on the wrong dwellings, passed the 1974 amendment to the Federal Tort Claims Act to provide compensation for such victims."
 
 Id.
 
 at *6 (quoting
 
 Solomon v. United States
 
 ,
 
 559 F.2d 309
 
 , 310 (5th Cir. 1977) (per curiam)). As "the law enforcement proviso was enacted as a response to specific eg[ ]regious behavior during raids conducted by federal law enforcement officers," the Court concluded it "was not intended to be expansive enough to cover airport security screeners."
 
 Id.
 
 at *7.
 

 The District Court also ruled in the Government's favor on Pellegrino's remaining claims, and Pellegrino then filed this appeal.
 
 [6]
 

 II. Jurisdiction and Standard of Review
 

 The District Court had jurisdiction over this action pursuant to
 
 28 U.S.C. §§ 1346
 
 (b) and 1331.
 
 See
 

 S.R.P. ex rel. Abunabba v. United States
 
 ,
 
 676 F.3d 329
 
 , 331-32 (3d Cir. 2012) ;
 
 Egervary v. Young
 
 ,
 
 366 F.3d 238
 
 , 245 (3d Cir. 2004). We have jurisdiction pursuant to
 
 28 U.S.C. § 1291
 
 . We exercise plenary review over the District Court's interpretation of the FTCA.
 
 See
 

 Baer v. United States
 
 ,
 
 722 F.3d 168
 
 , 172 (3d Cir. 2013).
 

 III. Legal Background
 

 A. The Federal Tort Claims Act
 

 "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."
 
 FDIC v. Meyer
 
 ,
 
 510 U.S. 471
 
 , 475,
 
 114 S.Ct. 996
 
 ,
 
 127 L.Ed.2d 308
 
 (1994). The FTCA creates a layered scheme waiving and then reasserting immunity. At the first level, the FTCA waives sovereign immunity for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."
 
 28 U.S.C. § 1346
 
 (b)(1).
 
 [7]
 
 However, that broad waiver is limited by a number of exceptions, which we have construed as akin to affirmative defenses.
 
 See
 

 Abunabba
 
 ,
 
 676 F.3d at
 
 333 n.2. As relevant here, the "intentional tort exception"
 
 [8]
 
 preserves the Government's immunity for "[a]ny claim arising out of assault, battery, false imprisonment, false
 arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights."
 
 28 U.S.C. § 2680
 
 (h). Finally, the FTCA includes an exception to that exception-the "law enforcement proviso"-which waives immunity for certain intentional torts committed by "investigative or law enforcement officers."
 

 Id.
 

 That proviso is at issue in this case.
 

 Read together, these subsections provide that while private citizens are barred from bringing suit against federal employees for many intentional torts, they may nonetheless bring suit for a subset of these torts-"assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution"-if the alleged act was committed by an "investigative or law enforcement officer."
 

 Id.
 

 The law enforcement proviso defines "investigative or law enforcement officer" to "mean[ ] any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."
 

 Id.
 

 Because Pellegrino asserts intentional tort claims arising out of the actions of TSOs, we must determine as a matter of statutory interpretation whether TSOs qualify as "investigative or law enforcement officers" such that the claims fall within the proviso.
 

 B.
 
 Vanderklok v. United States
 

 Contrary to the Government's assertion, we did not resolve this issue in its favor in our recent decision in
 
 Vanderklok v. United States
 
 ,
 
 868 F.3d 189
 
 (3d Cir. 2017). But that case does provide some important touchpoints for assessing the question now squarely before us.
 

 In
 
 Vanderklok
 
 , the plaintiff brought various claims against a TSO, including claims under the FTCA and a claim under
 
 Bivens
 
 for retaliatory prosecution in violation of the First Amendment.
 

 Id.
 

 at 195
 
 . The District Court denied the TSO's qualified immunity defense to the
 
 Bivens
 
 claim, and the TSO appealed.
 

 Id.
 

 at 196
 
 . We reversed the District Court's order in part, concluding that a
 
 Bivens
 
 cause of action for First Amendment retaliatory prosecution was not available to the plaintiff in those circumstances.
 

 Id.
 

 at 209
 
 .
 

 In evaluating whether it was permissible to imply this
 
 Bivens
 
 claim, we considered two questions: (1) whether an alternative process-namely, an FTCA claim-was available to protect the constitutional interests at stake; and (2) whether there were special factors counseling against implying a
 
 Bivens
 
 cause of action in this context.
 
 See
 

 id.
 

 at 200
 
 . In addressing the first of these issues, we noted both the District Court's conclusion "that [the TSO] was not an investigative or law enforcement agent because he was not an 'officer' of the United States under [the FTCA's] definition" and its reasoning that the FTCA distinguished between "employee[s]" and "officer[s]," with only the latter being used in the law enforcement proviso.
 

 Id.
 

 at 203
 
 . The District Court also observed that the ATSA, "which created the TSA[,] designates as 'law enforcement personnel' only those TSA agents who are '(1) authorized to carry and use firearms; (2) vested with the degree of the police power; and (3) identifiable by appropriate indicia of authority.' "
 

 Id.
 

 (alteration omitted) (quoting
 
 49 U.S.C. § 44903
 
 (a)(1)-(3) ). Because the TSO was not "law enforcement personnel" under that definition, the District Court determined he was an employee, not an officer, and therefore was not subject to the law enforcement proviso.
 
 See
 
 id.
 

 Although we recounted this reasoning, we were careful to emphasize that "[t]he District Court's decision about the applicability of the law enforcement proviso is not on appeal at this time" and that our focus was on the availability of a
 
 Bivens
 
 action.
 

 Id.
 

 We then concluded that, even without an alternative process (an FTCA claim) available to the plaintiff, we would not imply a
 
 Bivens
 
 claim because special factors unique to the airport-security context counseled heavily against doing so. We identified several such factors: (a) TSA agents are part of the country's national-security apparatus; (b) Congress is in a better position than the Court to recognize a new species of liability; and (c) TSA agents are not typically law enforcement officers.
 

 Id.
 

 at 206-08
 
 . In discussing point (c), we referred back to our discussion of the FTCA claim and emphasized the highly circumscribed and administrative nature of the TSO role:
 

 TSA employees typically are not law enforcement officers and do not act as such. As previously discussed, only those TSA employees specifically designated by the Under Secretary with the responsibilities of an officer, in accordance with
 
 49 U.S.C. § 44903
 
 (a), operate like police officers. As a result, line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers.
 
 See
 

 49 C.F.R. § 1542.213
 
 (delineating mandatory training). Instead, they are instructed to carry out administrative searches and contact local law enforcement if they encounter situations requiring action beyond their limited though important responsibilities.
 
 Cf.
 

 49 C.F.R. § 1542.215
 
 (providing for "[u]niformed law enforcement personnel in the number and manner adequate to support" passenger screenings). Since a First Amendment retaliatory prosecution claim hinges, in part, on whether the allegedly offending government employee had probable cause to take some enforcement action, a
 
 Bivens
 
 claim is poorly suited to address wrongs by line TSA employees.
 

 Vanderklok
 
 ,
 
 868 F.3d at 208-09
 
 (citation omitted).
 
 [9]
 

 This ruling was one of the "portions of the opinion necessary to th[e] result," and thus not dictum.
 
 Seminole Tribe of Fla. v. Florida
 
 ,
 
 517 U.S. 44
 
 , 67,
 
 116 S.Ct. 1114
 
 ,
 
 134 L.Ed.2d 252
 
 (1996) ;
 
 see also
 

 In re Friedman's Inc.
 
 ,
 
 738 F.3d 547
 
 , 552 (3d Cir. 2013) (explaining that a statement is not dictum if it is "necessary to our ultimate holding"). However, we ruled in
 
 Vanderklok
 
 only that TSOs are not law enforcement officers for purposes of a
 
 Bivens
 
 claim. Thus, while there may be good reasons to interpret the law enforcement proviso consistently with our
 
 Bivens
 
 case law, we agree with Amicus that
 
 Vanderklok
 
 addressed a different category of claim and is not dispositive of the question presented today.
 

 IV. Analysis of Intentional Tort FTCA Claims and the Law Enforcement Proviso
 

 In support of their respective positions on whether TSOs qualify as "investigative
 or law enforcement officers," the parties offer very different interpretations of § 2680(h) 's law enforcement proviso.
 

 Amicus contends that because the screenings performed by TSOs qualify as "searches" under the Fourth Amendment,
 
 see
 

 George v. Rehiel
 
 ,
 
 738 F.3d 562
 
 , 577 (3d Cir. 2013), TSOs "execute searches" for purposes of the proviso. Moreover, Amicus argues, the definition's reference to "any" officer shows that Congress intended for the term to be construed broadly and that "officer" itself has a broad, elastic definition.
 
 See
 
 Amicus Br. at 22 (stating that "officer" is defined as "[o]ne who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions" (alteration in original) (quoting Black's Law Dictionary (4th ed. 1968))). Amicus relies, at bottom, on the following syllogism: (a) federal workers who are authorized to perform
 
 any
 
 type of search are "investigative or law enforcement officers"; (b) TSA screeners perform searches;
 
 ergo
 
 (c) TSA screeners are "investigative or law enforcement officers."
 

 The Government, meanwhile, argues that the law enforcement proviso is designed to cover only
 
 traditional
 
 investigative or law enforcement officers, i.e., those who possess criminal justice powers. The Government contends that TSA screeners have much more circumscribed powers-as opposed to, for instance, FBI or DEA agents-and therefore are not covered by the proviso. The Government also argues that TSOs are "employees," not "officers," and that the limited administrative searches that they perform do not constitute "searches" under the proviso.
 

 We agree with the Government. Based on the proviso's text, structure, context, purpose, and history, as well as the relevant case law, we are persuaded that the phrase "investigative or law enforcement officers" is limited in scope and refers only to officers with criminal law enforcement powers. Because TSOs only conduct administrative searches and do not have such powers, they are not subject to the law enforcement proviso, and the Government's sovereign immunity bars this action.
 

 A. Interpretation of the Law Enforcement Proviso
 

 1. Text
 

 As in all cases in which we interpret a statute, to determine the scope of the phrase "investigative or law enforcement officer"-meaning "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law"-under § 2680(h), "we look first to its language, giving the words used their ordinary meaning,"
 
 Levin v. United States
 
 ,
 
 568 U.S. 503
 
 , 513,
 
 133 S.Ct. 1224
 
 ,
 
 185 L.Ed.2d 343
 
 (2013) (quoting
 
 Moskal v. United States
 
 ,
 
 498 U.S. 103
 
 , 108,
 
 111 S.Ct. 461
 
 ,
 
 112 L.Ed.2d 449
 
 (1990) ). In addition to the statutory language at issue, we consider "the specific context in which that language is used, and the broader context of the statute as a whole."
 
 Robinson v. Shell Oil Co.
 
 ,
 
 519 U.S. 337
 
 , 341,
 
 117 S.Ct. 843
 
 ,
 
 136 L.Ed.2d 808
 
 (1997) ;
 
 see also
 

 Abramski v. United States
 
 , --- U.S. ----,
 
 134 S.Ct. 2259
 
 , 2267,
 
 189 L.Ed.2d 262
 
 (2014) (explaining that courts must "interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose' " (quoting
 
 Maracich v. Spears
 
 ,
 
 570 U.S. 48
 
 ,
 
 133 S.Ct. 2191
 
 , 2209,
 
 186 L.Ed.2d 275
 
 (2013) )).
 
 [10]
 

 With these considerations in mind, we conclude that the law enforcement proviso covers only criminal law enforcement officers.
 

 To start, we find it important that the FTCA repeatedly distinguishes between
 
 officers
 
 and
 
 employees
 
 . The FTCA waives sovereign immunity for certain acts and omissions of an "employee."
 
 28 U.S.C. § 1346
 
 (b)(1) ;
 
 see also
 
 id.
 

 § 2671 (" 'Employee of the government' includes (1) officers or employees of any federal agency ....");
 

 id.
 

 § 2680(a) (discretionary-function exception referring to "an employee"). However, the law enforcement proviso refers not to "employees," but to "investigative or law enforcement
 
 officers
 
 ."
 

 Id.
 

 § 2680(h) (emphasis added). The proviso again uses that term in defining "investigative or law enforcement officers" to mean any "officer" with the powers specified.
 

 Id.
 

 Given that Congress used the word "officer" rather than "employee" in the proviso, we are reluctant to interpret "officer" in a way that would conflate those terms.
 
 See
 

 generally
 

 Sosa v. Alvarez-Machain
 
 ,
 
 542 U.S. 692
 
 , 711 n.9,
 
 124 S.Ct. 2739
 
 ,
 
 159 L.Ed.2d 718
 
 (2004) (referring to "the usual rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended" (citation omitted)). This militates against Amicus's interpretation of this term, which is materially indistinguishable from the word "employee."
 
 [11]
 

 We find additional support in the canon
 
 noscitur a sociis
 
 , which "implements the idea that the meaning of a word should be determined by considering the words with which it is associated in context."
 
 Flores v. Att'y Gen.
 
 ,
 
 856 F.3d 280
 
 , 295 n.80 (3d Cir. 2017). Each of the powers listed in the law enforcement proviso-"to execute searches, to seize evidence, or to make arrests for violations of Federal law"-has criminal law connotations.
 
 See, e.g.
 
 ,
 
 Hernandez v. United States
 
 ,
 
 34 F.Supp.3d 1168
 
 , 1179 (D. Colo. 2014) ("Each of these functions are commonly understood to be traditional law enforcement functions."). For instance, "execute a search" is a phrase typically used when a warrant is involved,
 
 see, e.g.
 
 ,
 
 18 U.S.C. § 3109
 
 (explaining when an officer may break a door or window in order "to execute a search warrant"), and Congress generally does not use this phrase when granting employees the power to perform administrative searches,
 
 see, e.g.
 
 ,
 
 29 U.S.C. § 657
 
 (a)(2) (providing that Occupational Safety and Health Administration (OSHA) inspectors may "inspect and investigate during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, any such place of employment and all pertinent conditions, structures, machines, apparatus, devices, equipment, and materials therein"). The
 other powers-"to seize evidence" and, especially, "to make arrests for violations of Federal law"-also sound in criminal law.
 
 See, e.g.
 
 ,
 
 Arizona v. Hicks
 
 ,
 
 480 U.S. 321
 
 , 326,
 
 107 S.Ct. 1149
 
 ,
 
 94 L.Ed.2d 347
 
 (1987) ("It is well established that under certain circumstances the police may
 
 seize evidence
 
 in plain view without a warrant[.]" (emphasis added) (quoting
 
 Coolidge v. New Hampshire
 
 ,
 
 403 U.S. 443
 
 , 465,
 
 91 S.Ct. 2022
 
 ,
 
 29 L.Ed.2d 564
 
 (1971) )). Each of these phrases helps give meaning to the others, reinforcing that the phrase "to execute searches" refers to the power to search based on individualized suspicion, not merely to conduct an administrative search, and that the term "investigative or law enforcement officer" therefore means those officers who perform criminal law enforcement functions.
 
 [12]
 

 It is also significant that the law enforcement proviso covers just a subset of the torts listed in the intentional tort exception. While the intentional tort exception preserves immunity for the torts of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, and interference with contract rights, the law enforcement proviso waives immunity for only half of these-assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution.
 
 See
 

 28 U.S.C. § 2680
 
 (h). In other words, the law enforcement proviso waives immunity for the types of tort claims typically asserted against criminal law enforcement officers, while preserving immunity for other tort claims that are asserted more broadly against federal employees. This further supports our conclusion that the law enforcement proviso is designed to cover only criminal law enforcement officers.
 

 Our textual analysis is further buttressed by the fact that the words to be defined here-"investigative or law enforcement officer"-typically refer to criminal law enforcement.
 
 See generally
 

 United States v. Stevens
 
 ,
 
 559 U.S. 460
 
 , 474,
 
 130 S.Ct. 1577
 
 ,
 
 176 L.Ed.2d 435
 
 (2010) ("[A]n unclear definitional phrase may take meaning from the term to be defined."). We have identified only one other context in which Congress has used the phrase "investigative or law enforcement officer." That is the context of criminal wiretapping
 and electronic tracking: The phrase is repeated throughout Title III of the Omnibus Crime Control and Safe Streets Act of 1968,
 
 see
 

 18 U.S.C. §§ 2510
 
 - 2522, and the Electronic Communications Privacy Act of 1986 (ECPA), which amended Title III and added new provisions governing "pen registers and trap and trace devices,"
 
 see
 

 18 U.S.C. §§ 3121
 
 - 3127.
 
 [13]
 
 Title III provides standards for when "investigative or law enforcement officers" may intercept and use private communications,
 
 see generally
 

 Gelbard v. United States
 
 ,
 
 408 U.S. 41
 
 , 46,
 
 92 S.Ct. 2357
 
 ,
 
 33 L.Ed.2d 179
 
 (1972), and the ECPA does the same for the use of pen registers and trap and trace devices. These statutes concern the acquisition of evidence for purposes of
 
 criminal
 
 law investigations, as Title III's definition of "investigative or law enforcement officer" makes clear: " 'Investigative or law enforcement officer' means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses."
 
 18 U.S.C. § 2510
 
 (7).
 
 [14]
 

 Likewise, while Congress has used the phrase "law enforcement officer" much more frequently, the term invariably refers to individuals who are involved in
 
 criminal
 
 law enforcement.
 
 See, e.g.
 
 ,
 
 12 U.S.C. § 248
 
 (q)(4) (defining "law enforcement officers" for purposes of section authorizing the Board of Governors of the Federal Reserve System to designate personnel to protect bank premises, carry firearms, and make arrests);
 
 18 U.S.C. § 115
 
 (c)(1) (defining "[f]ederal law enforcement officer" for purposes of statute criminalizing efforts to impede, intimidate, or interfere with officials, judges, and law enforcement officers);
 
 18 U.S.C. § 1515
 
 (a)(4) (defining "law enforcement officer" for purposes of witness-tampering statute). We have not found any instance in which this term covers an individual who performs only administrative duties.
 
 [15]
 

 While none of these various textual arguments is, standing alone, dispositive,
 each points toward the same conclusion: The law enforcement proviso covers only officers who are engaged in criminal law enforcement.
 

 2. Purpose
 

 Our reading is also supported by our understanding of Congress's purpose in enacting the law enforcement proviso.
 
 See
 

 Dolan v. U.S. Postal Serv.
 
 ,
 
 546 U.S. 481
 
 , 486,
 
 126 S.Ct. 1252
 
 ,
 
 163 L.Ed.2d 1079
 
 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute ....");
 
 see also
 

 King v. Burwell
 
 , --- U.S. ----,
 
 135 S.Ct. 2480
 
 , 2496,
 
 192 L.Ed.2d 483
 
 (2015) (adopting the interpretation of a statute that "can fairly be read consistent with what we see as Congress's plan").
 

 Critically, interpreting "officer" to have a criminal law component avoids an unprincipled expansion of the Government's waiver of sovereign immunity. Countless federal employees are empowered to perform "searches." The Secretary of Commerce, for instance, may "make such inspection of the books, records, and other writings and premises and property of any person" whose activities relate to weather modification, 15 U.S.C. § 330c(a) ; FDA inspectors may make "examination and inspection of all meat food products prepared for commerce in any slaughtering, meat-canning, salting, packing, rendering, or similar establishment" and "shall have access at all times, by day or night, whether the establishment be operated or not, to every part of said establishment,"
 
 21 U.S.C. § 606
 
 (a) ; and EPA employees may enter establishments where hazardous wastes "have been generated, stored, treated, disposed of, or transported from" and "inspect and obtain samples" of any such wastes,
 
 42 U.S.C. § 6927
 
 (a).
 
 [16]
 
 Drug tests also constitute searches under the Fourth Amendment.
 
 See, e.g.
 
 ,
 
 Nat'l Treasury Emps. Union v. Von Raab
 
 ,
 
 489 U.S. 656
 
 , 665,
 
 109 S.Ct. 1384
 
 ,
 
 103 L.Ed.2d 685
 
 (1989) ;
 
 Skinner v. Ry. Labor Execs.' Ass'n
 
 ,
 
 489 U.S. 602
 
 , 616-17,
 
 109 S.Ct. 1402
 
 ,
 
 103 L.Ed.2d 639
 
 (1989). In short, reading the proviso to include administrative searches would sweep into its ambit large swaths of the federal workforce, producing an unprecedented expansion of the United States' tort liability. While Amicus expressly argued that these types of employees should be covered by the law enforcement proviso,
 
 see
 
 Corrected Tr. of Oral Arg. at 8:3-9:10, we will not impute to Congress so significant a waiver of sovereign immunity without far more explicit evidence of its intent,
 
 see
 

 King
 
 ,
 
 135 S.Ct. at 2494
 
 (rejecting a proposed interpretation of a statutory scheme because "[i]t is implausible that Congress meant the Act to operate in this manner").
 

 3. Legislative History
 

 Legislative history cannot overcome the clear language of a statute, but it can "play a confirmatory role in resolving ambiguity when statutory language and structure support a given interpretation."
 
 G.L. v. Ligonier Valley Sch. Dist. Auth.
 
 ,
 
 802 F.3d 601
 
 , 621-22 (3d Cir. 2015) ;
 
 see also
 

 Catwell v. Att'y Gen.
 
 ,
 
 623 F.3d 199
 
 , 208 (3d Cir. 2010). Here, the legislative history of the law enforcement proviso confirms our interpretation of the text.
 

 Of particular note, Congress contemporaneously considered three bills to amend the broad immunity preserved by the intentional tort exception-S. 2558, 93d Cong. (1973); H.R. 8245, 93d Cong. (1973); and H.R. 10439, 93d Cong. (1973)-with Members referring regularly to the other bills as each was debated. Two of the bills (S. 2558 and H.R. 10439) waived sovereign immunity for the specified intentional torts for
 
 all
 
 federal employees. Only one-H.R. 8245-limited the waiver of immunity to "investigative or law enforcement officers." H.R. 8245 was the bill eventually signed into law, codifying the law enforcement proviso in its present form.
 
 See
 
 Act of March 16, 1974, Pub. L. No. 93-253,
 
 88 Stat. 50
 
 (codified at
 
 28 U.S.C. § 2680
 
 (h) ).
 
 See generally
 
 John C. Boger et al.,
 
 The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis
 
 ,
 
 54 N.C. L. Rev. 497
 
 , 510-17 (1976).
 

 Three other aspects of the legislative history also reflect Congress's intention to limit the proviso to criminal law enforcement officers. First, Congress was spurred to action by two ill-conceived raids conducted by federal narcotics agents in Collinsville, Illinois. In these raids, the agents, acting without warrants, kicked in doors without warning, drew weapons, and terrorized the residents, only to determine later that they had entered the wrong houses. As one committee report stressed, "[t]here is no effective legal remedy against the Federal Government for the actual physical damage, mu[ch] less the pain, suffering and humiliation to which the Collinsville families have been subjected." S. Rep. No. 93-588, at 2 (1973),
 
 as reprinted in
 
 1974 U.S.C.C.A.N. 2789, 2790. Members of Congress returned again and again to the problem of these "no knock" raids and the need to create a meaningful remedy for the victims.
 
 See, e.g.
 
 , 120 Cong. Rec. 5287 (1974) (statement of Rep. Wiggins) ("I believe the Members ought to realize that this Senate amendment was an emotional response to the unfortunate Collinsville case ...."). Thus, the driving concern behind the enactment of H.R. 8245 was the potential for abuse of the devastating powers wielded by criminal law enforcement.
 

 Second, Members of Congress explicitly discussed the fact that H.R. 8245, unlike the other bills, would not cover federal employees who perform administrative searches. Some observed that H.R. 8245 "only applies to law enforcement officers. It does not apply to any other Federal employees that might violate the rights of an individual." 120 Cong. Rec. 5287 (statements of Reps. Donohue and Wiggins). Others, urging passage of the bills that waived immunity for all federal employees, lamented that H.R. 8245, by limiting the waiver to "investigative or law enforcement officers," would provide no remedy for assaults committed by those who perform only administrative searches:
 

 I can give you an illustration. We have Department of Agriculture investigators who go into look at books and records. We have Defense Department auditors to look at books and records. I can see where we can get in a dispute where records should be shown or not shown and a report shown by mistake and the contractor takes it away and says you shouldn't have seen that and some sort of assault occurs. The assault may not be intentionally inflicted to create any more damage than to keep him away. He may trip over backward and hit his head and fracture his skull and even die. They are not law enforcement officers even under this definition. They don't qualify.
 

 Federal Tort Claims Amendments: Hearings on H.R. 10439 Before the Subcomm. on Claims and Governmental Relations of the H. Comm. on the Judiciary
 
 , 93d Cong.
 

 18 (1974) [hereinafter
 
 H.R. 10439 Hearings
 
 ] (statement of Irving Jaffe, Acting Assistant Att'y Gen.);
 
 see also
 

 id.
 
 at 15 (statement of Jaffe) ("It should be noted that ... H.R. 8245 is confined in its applicability to Federal investigative or law enforcement officers, while ... H.R. 10439 would waive the sovereign immunity of the United States as to the same acts or omissions on the part of all Government employees.").
 

 Third, when the drafters selected for the proviso what they characterized as "the types of tort[s] most frequently arising out of activities of Federal law enforcement officers,"
 
 [17]
 
 they selected those torts (assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution) typically claimed against traditional law enforcement officers performing criminal law functions.
 

 The criminal law boundaries of the law enforcement proviso are also reinforced by the legislative history of a related statutory provision that incorporates the proviso:
 
 31 U.S.C. § 3724
 
 . That section authorizes the Attorney General to settle, for up to $50,000, claims brought specifically against an "investigative or law enforcement officer as defined in [the law enforcement proviso of] section 2680(h)... who is employed by the Department of Justice acting within the scope of employment."
 
 31 U.S.C. § 3724
 
 (a).
 
 [18]
 
 As originally drafted, § 3724 was written to cover the settlement of claims arising from the actions of "any officer
 
 or employee
 
 of the Federal Bureau of Investigation or other law enforcement component of the Department of Justice." H.R. Rep. No. 101-46, at 7-8 (1989) (emphasis added). But Brent Hatch, Deputy Assistant Attorney General of the DOJ Civil Division, testified that this language was "too vague," as it might then apply to "the litigating arms of the Antitrust Division or of the Civil Rights Division, for example," whose functions "are aimed at the enforcement of the law."
 

 Id.
 

 at 8
 
 . According to Hatch, "the intent of the bill is narrower" and thus would be better captured by the FTCA language allowing compensation for certain injuries caused by "investigative or law enforcement officers."
 

 Id.
 

 Congress proceeded to adopt this construction.
 
 [19]
 

 In sum, the legislative history of the proviso, as well as § 3724, fortifies our conclusion that Congress was focused on violations caused during criminal law enforcement activities and intentionally designed a remedy for those violations.
 

 4. Case Law
 

 Our interpretation of the law enforcement proviso is also consistent with our
 case law and that of other Courts of Appeals.
 

 In
 
 Matsko v. United States
 
 ,
 
 372 F.3d 556
 
 (3d Cir. 2004), for example, we categorically excluded classes of employees from the law enforcement proviso. There, the plaintiff filed an FTCA action concerning injuries he sustained when a Mine Safety and Health Administration (MSHA) inspector slammed his face into a briefcase lying on a desk and asserted that "his claim fit[ ] within the FTCA's special treatment of assaults by investigative or law enforcement officers."
 

 Id.
 

 at 560
 
 . We first observed that the law enforcement proviso did not apply because the mine inspector did not commit the torts in the course of executing a search, seizure, or arrest, as we previously required under
 
 Pooler v. United States
 
 ,
 
 787 F.2d 868
 
 , 872 (3d Cir. 1986). But we went on to explain that, even if
 
 Pooler
 
 was incorrectly decided, the mine inspector was not an "investigative or law enforcement officer" for the independent reason that "employees of administrative agencies, no matter what investigative conduct they are involved in, do not come within the § 2680(h) exception."
 
 Matsko
 
 ,
 
 372 F.3d at 560
 
 . In support of this conclusion, we cited
 
 EEOC v. First National Bank of Jackson
 
 ,
 
 614 F.2d 1004
 
 , 1007-08 (5th Cir. 1980), in which, we explained, the Fifth Circuit had refused "to apply the exception to an Equal Employment Opportunity Commission agent,"
 
 Matsko
 
 ,
 
 372 F.3d at 560
 
 .
 

 Matsko
 
 remains the law of this Circuit
 
 [20]
 
 and reflects the line we have drawn, in construing the law enforcement proviso, between administrative personnel performing solely administrative functions and those-whether employed by an administrative agency or a law enforcement agency-expressly designated law enforcement officers or assigned law enforcement duties. Indeed, the MSHA inspector in
 
 Matsko
 
 had "authority to inspect mines and investigate possible violations,"
 

 id.
 

 , just as the EEOC agent in
 
 First National Bank of Jackson
 
 had "access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices,"
 
 614 F.2d at 1007-08
 
 (citation omitted). Those employees were authorized to conduct administrative searches, but because their jobs did not include criminal law enforcement responsibilities, they were considered to fall outside the law enforcement proviso.
 
 [21]
 

 That approach is also consistent with decisions of other Courts of Appeals, which
 have treated only those performing criminal law enforcement duties as "investigative or law enforcement officers" under the proviso. For example, the D.C. Circuit has concluded that postal inspectors, who are empowered to investigate criminal matters,
 
 see
 

 18 U.S.C. § 3061
 
 , are covered by the proviso.
 
 See
 

 Moore v. United States
 
 ,
 
 213 F.3d 705
 
 , 708 (D.C. Cir. 2000). Courts have also ruled that the proviso covers customs officers,
 
 see
 

 Nurse v. United States
 
 ,
 
 226 F.3d 996
 
 , 1002-03 (9th Cir. 2000), Veterans' Administration (VA) police officers,
 
 see
 

 Celestine v. United States
 
 ,
 
 841 F.2d 851
 
 , 852-53 (8th Cir. 1988) (per curiam), U.S. Marshals,
 
 see
 

 Hoston v. Silbert
 
 ,
 
 681 F.2d 876
 
 , 879 (D.C. Cir. 1982) (per curiam), Immigration and Naturalization Service (INS) agents,
 
 see
 

 Caban v. United States
 
 ,
 
 671 F.2d 1230
 
 , 1234 (2d Cir. 1982), FBI agents,
 
 see
 

 Brown v. United States
 
 ,
 
 653 F.2d 196
 
 , 198 (5th Cir. 1981), and federal correctional officers,
 
 see
 

 Hernandez v. Lattimore
 
 ,
 
 612 F.2d 61
 
 , 64 n.7 (2d Cir. 1979). Each of those individuals participates in criminal law enforcement.
 
 [22]
 

 Likewise, in
 
 Bunch v. United States
 
 , the Seventh Circuit recently held that there were genuine disputes of material fact as to whether a Bureau of Alcohol, Tobacco, and Firearms (ATF) forensic chemist fell within the proviso precisely because the forensic chemist may have been an "ATF officer" authorized to participate in criminal investigations under
 
 18 U.S.C. § 846
 
 and its implementing regulations, and his job duties appeared to "include[ ] the identification of relevant evidence for colleagues during crime-scene investigations."
 
 880 F.3d 938
 
 , 943, 945 (7th Cir. 2018). To be sure, that court rejected the notion that "executing searches" is limited to executing search warrants,
 

 id.
 

 at 945
 
 , and highlighted that the proviso applies to both "investigative
 
 and
 
 law-enforcement officers" who execute searches,
 

 id.
 

 at 944
 
 . But it relied on the fact that ATF officers are authorized under Title 18-the federal criminal code-"to inspect the site of any accident, or fire, in which there is reason to believe that explosive materials were involved,"
 

 id.
 

 at 943
 
 (quoting
 
 18 U.S.C. § 846
 
 (1994) ), and it offered, as examples of the types of searches covered by the proviso, searches incident to arrest, protective sweeps, and searches conducted pursuant to the automobile exception,
 

 id.
 

 at 945 -i.e., searches conducted by criminal law enforcement officers.
 

 On the other hand, the Courts of Appeals have held that the proviso does not cover positions that lack a criminal law component. In
 
 First National Bank of Jackson
 
 , for example, the Fifth Circuit refused to apply the proviso to EEOC agents, explicitly distinguishing between federal employees who "have access to, for the purpose of examination, and the right to copy any evidence of any person being investigated or proceeded against that relates to unlawful employment practices," and "investigative or law enforcement officers" who have the power to "execute searches."
 
 614 F.2d at 1007-08
 
 (citation omitted). Similarly, in
 
 Wilson v. United States
 
 , the Second Circuit held that parole
 officers do not qualify.
 
 959 F.2d 12
 
 , 15 (2d Cir. 1992) (per curiam). While acknowledging that parole officers have limited authority to seize evidence, the court determined that because that power "depends on the consent of the person from whom the evidence is to be taken, however, parole officers lack the seizure power contemplated by section 2680(h), and thus cannot be considered law enforcement personnel."
 

 Id.
 

 The Courts of Appeals have also concluded that the law enforcement proviso does not cover federal prosecutors,
 
 see
 

 Moore
 
 ,
 
 213 F.3d at 710
 
 , security guards,
 
 see
 

 Solomon
 
 ,
 
 559 F.2d at 310
 
 , or doctors at a VA hospital,
 
 see
 

 Johnson v. United States
 
 ,
 
 547 F.2d 688
 
 , 691 (D.C. Cir. 1976) (per curiam). In short, consistent with
 
 Matsko
 
 , our Sister Circuits have consistently interpreted the proviso to include federal officers who are involved in criminal law enforcement and to exclude federal employees who are not.
 
 [23]
 

 * * *
 

 Based on these various indicia of meaning-the law enforcement proviso's text, structure, context, purpose, and history, as well as relevant case law-we are persuaded that the phrase "investigative or law enforcement officers" refers only to
 
 criminal
 
 law enforcement officers, not to federal employees who conduct only administrative searches.
 

 B. The Proviso's Application to TSA Screeners
 

 Given our holding as to the scope of the proviso, we have little difficulty concluding it does not cover TSA screeners. No Court of Appeals has yet decided the question precedentially,
 
 [24]
 
 and district courts have reached different conclusions.
 
 [25]
 
 However, as indicated in
 
 Vanderklok
 
 , confirmed in the ATSA (the TSA's founding statute), and demonstrated in practice, TSA screeners conduct only administrative searches, are not criminal law enforcement officers, and thus do not qualify as "investigative or law enforcement officers" under the FTCA.
 

 As a starting point, we draw valuable guidance from
 
 Vanderklok
 
 . As we explained there, "TSA employees typically are not law enforcement officers and do not act as such."
 
 Vanderklok
 
 ,
 
 868 F.3d at 208
 
 . Underpinning that rationale was our prior case law upholding TSA screenings as permissible suspicionless checkpoint searches under the administrative search doctrine.
 
 See
 

 George
 
 , 738 F.3d at 577 ;
 

 United States v. Hartwell
 
 ,
 
 436 F.3d 174
 
 , 178-81 (3d Cir. 2006). Against that backdrop, we explained that TSA screeners have limited authority: "[T]hey are instructed to carry out administrative searches and contact local law enforcement if they encounter situations requiring action beyond their limited though important responsibilities."
 
 Vanderklok
 
 ,
 
 868 F.3d at 209
 
 .
 

 Reinforcing the distinction we recognized in
 
 Vanderklok
 
 , the ATSA frequently distinguishes between "employees" who conduct administrative searches and "law enforcement officers." For example, it specifies that the "screening[s]" conducted by TSOs "shall be carried out by a Federal Government employee (as defined in section 2105 of title 5, United States Code )."
 
 49 U.S.C. § 44901
 
 (a).
 
 [26]
 
 This is in contrast to
 
 49 U.S.C. § 114
 
 (p), which permits the TSA administrator to designate particular TSA employees as "law enforcement officer[s]" empowered to "carry a firearm," "make an arrest," and "seek and execute warrants for arrest or seizure of evidence," functions that squarely place them within the law enforcement proviso.
 
 [27]
 
 Those law enforcement officers are required to be stationed throughout airports to support TSOs and fulfill precisely those functions that TSOs have neither the authority nor the expertise to fulfill.
 
 See
 

 id.
 

 § 44901(h) ;
 
 49 C.F.R. § 1542.215
 
 . Such distinctions between TSOs and law enforcement officers recur throughout the statute.
 
 Compare
 

 49 U.S.C. § 114
 
 (e)(2) (providing that the Under Secretary is responsible for "hiring and retention of security screening personnel"),
 

 id.
 

 § 44901(a) (explaining that screenings will be performed by an "employee"),
 

 id.
 

 § 44935(e)-(f) (describing
 training programs, hiring qualifications, and employment standards for "[s]ecurity screeners"),
 
 and
 
 id.
 

 § 44936(a) (requiring background investigation of a "security screener"),
 
 with
 

 id.
 

 § 114(p) (describing "law enforcement officer[s]"),
 

 id.
 

 § 44901(h)(1) (requiring the deployment of "law enforcement personnel" at screening locations),
 

 id.
 

 § 44903(a) (defining "law enforcement personnel"),
 
 and
 
 id.
 

 § 44922 (permitting the Under Secretary to deputize "State and local law enforcement officers").
 

 Despite this clear statutory distinction, Amicus argues that TSOs must qualify as "law enforcement officers" because of their title-they are "transportation security
 
 officers
 
 "-and because they wear a badge that labels them as "officers." We are not persuaded that the word "officer" has this talismanic property, and it would be surprising indeed if such a superficial gloss were sufficient to trigger a waiver of federal sovereign immunity. There are many jobs that have the word "officer" in the title, such as "chief executive officer" or "title officer," but they unquestionably are not "investigative or law enforcement officer" positions. On the other hand, other jobs, like "special agent" or "postal inspector," do not have the word "officer" in the title, but they nonetheless qualify as "investigative or law enforcement officer" positions. Indeed, Amicus's argument, if anything, cuts the other way, for as we noted previously, TSOs were originally called "screeners," and their title was changed in 2005 merely as part of an effort to improve employee incentives and "upward mobility opportunities within [the] profession."
 
 [28]
 
 Specifically, it appears that the title change and related adjustments were intended to "give TSOs an opportunity to ... apply for DHS
 
 law enforcement positions
 
 "-further undermining the notion that TSOs already constitute a species of law enforcement officer. U.S. Gov't Accountability Office, GAO-07-299,
 
 Aviation Security
 
 56 (2007) (emphasis added). Thus, neither the TSO title nor the badge (which TSOs apparently began wearing two years after the conduct at issue in this case,
 
 see
 
 Press Release, Transp. Sec. Admin.,
 

 supra
 

 note 28
 
 ) speaks to the nature of the position or the scope of the accompanying authority.
 

 The statutory distinction between TSOs and law enforcement officers is also meaningful as a matter of practice, as demonstrated by TSA Management Directive No. 100.4 (Sept. 1, 2009), filed by Pellegrino, entitled "Transportation Security Searches." That directive separately defines "law enforcement officer," "TSA law enforcement officer," and "transportation security officer," and it stresses the limits of the authority of a "transportation security officer": TSOs may not perform screenings for the purpose of "detect[ing] evidence of crimes unrelated to transportation security."
 
 Id.
 
 ¶¶ 4, 6.A(4). If a TSO does discover such evidence, he or she is required to alert a supervisor or a law enforcement official. The TSO can "request[ ]" the individual to wait for law enforcement to arrive, but the individual is nevertheless "free to leave the checkpoint once applicable screening requirements have been completed successfully."
 
 Id.
 
 ¶ 6.A(4). By contrast, "TSA law enforcement officers," and only "TSA law enforcement officers," may engage in law enforcement activities, including investigations,
 detentions, and searches that "are not limited to administrative or special needs searches."
 
 Id.
 
 ¶ 6.D.
 

 Recognizing that TSA screeners conduct administrative, not criminal searches thus not only respects the distinction Congress has made between "employees" and "law enforcement officers" in the FTCA, it also reflects the different job responsibilities and training of TSA "screeners" and "law enforcement officers" prescribed by the ATSA and agency policy. As we explained in
 
 Vanderklok
 
 , unlike criminal law enforcement officers, "line TSA employees are not trained on issues of probable cause, reasonable suspicion, and other constitutional doctrines that govern law enforcement officers."
 
 868 F.3d at 208
 
 . Put differently, TSOs, like most administrative employees, do not receive training on the specific constitutional doctrines and legal standards relevant to assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution-the torts covered by the law enforcement proviso. And that follows logically from the fact that doctrines like probable cause, as we described in
 
 Vanderklok
 
 , while of central importance to criminal law enforcement officers, are largely irrelevant to a TSO's job. Acknowledging that TSOs are not law enforcement officers under the proviso has the added value of maintaining this practical coherence.
 

 Although all of these indicators-our case law, the TSA's governing statute, and agency policy and practice-confirm that TSOs conduct only routine administrative searches, the dissent argues that TSA screenings constitute "searches for violations of federal law because they are directed to illegal and prohibited items on passenger aircraft." Dissent at 238. But the fact that screenings are searches for prohibited items only points up why they are not searches "for violations of federal law": Screenings are aimed at items that must be removed before boarding-not at particular individuals-and their purpose is "an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent hijackings,"
 
 United States v. Aukai
 
 ,
 
 497 F.3d 955
 
 , 960 (9th Cir. 2007) (en banc) (quoting
 
 United States v. Davis
 
 ,
 
 482 F.2d 893
 
 , 908 (9th Cir. 1973) )-not to gather evidence of a crime with an eye toward criminal prosecution.
 
 [29]
 
 Although a screening might prompt a TSO to refer an individual to criminal authorities for such investigation and prosecution where that administrative search happens to turn up evidence of a crime, screenings themselves are not conducted for that purpose and we could not have upheld them in
 
 Hartwell
 
 under the administrative search doctrine as suspicionless checkpoint searches if they were.
 
 See
 

 City of Indianapolis v. Edmond
 
 ,
 
 531 U.S. 32
 
 , 41,
 
 121 S.Ct. 447
 
 ,
 
 148 L.Ed.2d 333
 
 (2000) ("We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing.");
 
 see also
 

 Florida v. Harris
 
 ,
 
 568 U.S. 237
 
 , 243,
 
 133 S.Ct. 1050
 
 ,
 
 185 L.Ed.2d 61
 
 (2013) (explaining that a police officer must have probable cause to conduct
 a search for "contraband or evidence of a crime").
 

 Nor are we persuaded that airport screenings are so distinct from other administrative searches that they should be treated differently under the proviso. The dissenting opinion contends that because TSA screeners are uniquely empowered by
 
 49 U.S.C. § 44901
 
 (g)(5) to conduct "a physical search together with manifest verification," the searches they conduct, unlike most administrative searches, are indistinguishable from
 
 Terry
 
 stops conducted by traditional criminal law enforcement officers. That offers a basis, according to the dissent, to bring TSA screeners within the proviso without sweeping in all other employees who conduct administrative searches.
 

 The problem with this approach is that it mistakes the subject matter of § 44901(g)(5) and is inconsistent with our precedent. For its part, § 44901(g)(5) does not authorize TSOs to conduct physical searches of passengers. Instead, that provision exclusively addresses searches of cargo.
 
 See
 

 49 U.S.C. § 44901
 
 (g)(1). And while a TSO's "[s]creening of individuals and property" can include "the inspection of individuals, accessible property, checked baggage, and cargo,"
 
 49 C.F.R. § 1546.207
 
 (a), a pat-down conducted as part of a screening is not analogous to a
 
 Terry
 
 stop.
 
 Terry
 
 stops require reasonable, articulable suspicion,
 
 see
 

 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 , 30,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968), and are directed to specific individuals; TSA screenings are not. As we observed in the analogous context of border searches, "patdowns, frisks, [and] luggage searches" in connection with screenings for entry are "routine" and "involv[e] neither a high expectation of privacy nor a seriously invasive search."
 
 United States v. Whitted
 
 ,
 
 541 F.3d 480
 
 , 485-86 (3d Cir. 2008). And as we explained in
 
 Hartwell
 
 -specifically addressing TSA screenings-such screenings are required of "every air passenger" and are "minimally intrusive," "public," and "well-tailored to protect personal privacy."
 
 436 F.3d at 180
 
 . These screenings, we emphasized, "escalat[e] in invasiveness only after a lower level of screening disclose[s] a reason to conduct a more probing search," so that even screenings that escalate to a pat-down may be properly categorized by their character at the outset as a "single search under the administrative search doctrine."
 

 Id.
 

 at 178, 180
 
 . In view of this precedent, categorizing passenger screenings up to and including pat-downs as routine administrative searches, the dissent's logic could not be cabined to TSA screeners, but instead would extend inexorably to all federal employees who perform administrative searches.
 
 [30]
 

 In sum, as the delineated duties of TSOs make clear, and as is the case with many federal agencies, there is a clear division between the criminal law enforcement and non-criminal law enforcement arms of the TSA. TSOs-like meat inspectors, OSHA workers, and other personnel who are permitted to perform only administrative searches-fall into the latter category and thus do not qualify as "investigative or law enforcement officers" under the law enforcement proviso of the FTCA. Because the proviso does not apply, Pellegrino's intentional tort claims are barred by
 § 2680(h) 's intentional tort exception, and the District Court correctly dismissed those claims based on the United States' sovereign immunity.
 
 [31]
 

 * * *
 

 We recognize that our holding here, combined with our decision in
 
 Vanderklok
 
 , means that individuals harmed by the intentional torts of TSOs will have very limited legal redress.
 
 [32]
 
 And we are sympathetic to the concerns this may raise as a matter of policy, particularly given the nature and frequency of TSOs' contact with the flying public. For most people, TSA screenings are an unavoidable feature of flying,
 
 49 U.S.C. § 44901
 
 (a), and they may involve thorough searches of not only the belongings of passengers but also their physical persons-searches that are even more rigorous and intimate for individuals who happen to be selected for physical pat-downs after passing through a metal detector or imaging scanner. For these reasons, Congress may well see fit to expand the proviso or otherwise legislate recourse for passengers who seek to assert intentional tort claims against TSOs. But such policy judgments, particularly as they relate to sovereign immunity and the public fisc, fall squarely in the realm of the legislative branch. Because Congress to date has limited the proviso to "investigative or law enforcement officers" and TSOs do not meet that definition, we will affirm the dismissal of Pellegrino's FTCA claims.
 

 V. Analysis of Other Claims
 

 We will also affirm the District Court's judgment as to Pellegrino's remaining claims. As for her other FTCA claims, "[t]he Federal Tort Claims Act [ ] bars actions against the United States for ... defamation,"
 
 Brumfield v. Sanders
 
 ,
 
 232 F.3d 376
 
 , 382 (3d Cir. 2000), and Pennsylvania law forecloses the rest,
 
 see
 

 Molzof v. United States
 
 ,
 
 502 U.S. 301
 
 , 305,
 
 112 S.Ct. 711
 
 ,
 
 116 L.Ed.2d 731
 
 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."). That is because, under Pennsylvania law, "recovery for the tort of intentional infliction of emotional distress [has been] reserved by the courts for only the most clearly desperate and ultra extreme conduct,"
 
 Hoy v. Angelone
 
 ,
 
 554 Pa. 134
 
 ,
 
 720 A.2d 745
 
 , 754 (1998), and a claim for negligent infliction of emotional distress is restricted to four scenarios,
 
 see
 

 Toney v. Chester Cty. Hosp.
 
 ,
 
 961 A.2d 192
 
 , 197-98 (Pa. Super. Ct. 2008), none of which is present here.
 
 [33]
 

 Nor did the District Court err in rejecting Pellegrino's
 
 Bivens
 
 claims of retaliatory prosecution under the First Amendment and malicious prosecution under the Fourth Amendment.
 
 [34]
 

 Vanderklok
 
 itself forecloses the retaliatory prosecution claim,
 
 see
 

 868 F.3d at 209
 
 , and the same "special factors" that we observed there counseled against implying a
 
 Bivens
 
 claim-that TSA screeners are part of the national-security system and protect the public safety, Congress should be the body to recognize new causes of action, and TSA screeners are not trained on the issues of probable cause that serve as the foundation of a retaliatory prosecution claim,
 

 id.
 

 at 206-09 -apply with equal force to Pellegrino's claim of malicious prosecution,
 
 see, e.g
 
 .,
 
 McKenna v. City of Philadelphia
 
 ,
 
 582 F.3d 447
 
 , 461 (3d Cir. 2009) (explaining that a malicious prosecution claim requires showing that prosecution was initiated without probable cause).
 
 [35]
 

 Pellegrino's FOIA claims also fail. In response to Pellegrino's FOIA request,
 
 [36]
 
 the TSA identified 375 pages of responsive documents, and withheld 90 of them, primarily on the ground that they were privileged and thus subject to Exemption 5 of FOIA.
 
 See
 

 5 U.S.C. § 552
 
 (b)(5) ;
 
 Dep't of Interior v. Klamath Water Users Protective Ass'n
 
 ,
 
 532 U.S. 1
 
 , 8,
 
 121 S.Ct. 1060
 
 ,
 
 149 L.Ed.2d 87
 
 (2001). We perceive no error in the District Court's conclusion that the TSA conducted an adequate search and that the documents it withheld were indeed exempt from production. The TSA's declaration attested to extensive searches, confirmed by the production of hundreds of responsive documents. And the District Court conducted an
 
 in camera
 
 review of the documents withheld and made its own finding that they fell within FOIA's exemption. Pellegrino has identified no basis to disturb those rulings.
 

 We are also unpersuaded that the District Court abused its discretion with respect to any of the case management orders challenged by Pellegrino. It was under no obligation to give Pellegrino an additional extension of time to file still more material when it had already granted her an extension of time to file her motion for reconsideration and response to the Government's motion for reconsideration, and Pellegrino had then filed a motion spanning hundreds of pages. Nor did it err
 in denying Pellegrino leave to amend her complaint yet again when the case had been ongoing for two years and Pellegrino had already amended three times.
 
 See generally
 

 Airborne Beepers & Video, Inc. v. AT&T Mobility LLC
 
 ,
 
 499 F.3d 663
 
 , 666-67 (7th Cir. 2007).
 

 As for the sealing orders, the documents subject to the first sealing order were filed under seal as Pellegrino requested, and the Court reasonably refused to issue a second sealing order to permit Pellegrino to file previously available evidence in support of her motion for reconsideration.
 
 See, e.g.
 
 ,
 
 Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros
 
 ,
 
 176 F.3d 669
 
 , 677 (3d Cir. 1999). And while Pellegrino argues that she needed to depose additional witnesses who were not made available to her, she has not established that this limitation prejudiced her in any way.
 
 See
 

 Anderson v. Wachovia Mortg. Corp.
 
 ,
 
 621 F.3d 261
 
 , 281 (3d Cir. 2010) (explaining that a discovery order will not be disturbed "absent a showing of actual and substantial prejudice").
 
 [37]
 

 In sum, the District Court dedicated an enormous amount of time and care to this case and its rulings were well within the broad scope of its discretion.
 

 VI. Conclusion
 

 For the foregoing reasons, we will affirm the judgment of the District Court.
 

 Throughout this opinion, we will use the terms "TSO" and "TSA screener" without distinction.
 

 Because the District Court granted summary judgment in the defendants' favor, we view the facts in the light most favorable to Pellegrino.
 
 See, e.g.
 
 ,
 
 Moody v. Atl. City Bd. of Educ.
 
 ,
 
 870 F.3d 206
 
 , 210 n.1 (3d Cir. 2017).
 

 Labbee was a supervisor, but because no party has claimed that her duties were materially different from those of Abdul-Malik or Kissinger, we will not distinguish among their positions.
 

 The District Court dismissed Waldman's claims, primarily for lack of standing. While both Pellegrino's and Waldman's names appear on Appellants' briefs, they have not challenged the District Court's dismissal of Waldman from this action. We therefore will treat Pellegrino as the sole appellant.
 

 At the motion-to-dismiss stage, the District Court first found that the individual defendants and the TSA were not proper defendants and dismissed all claims against them, substituting the United States as the sole defendant.
 
 See
 

 28 U.S.C. § 2679
 
 . The Court then permitted the false arrest, false imprisonment, and malicious prosecution claims to proceed against the United States.
 

 After the parties submitted their initial briefs, the Court appointed Paul M. Thompson of McDermott Will & Emery to serve as amicus curiae on behalf of Pellegrino, and Amicus and the Government have filed supplemental briefs addressing the issues presented in this case. We express our gratitude to Mr. Thompson for accepting this matter pro bono and for the quality of his briefing and argument in this case. Lawyers who act pro bono fulfill the highest service that members of the bar can offer to the legal profession.
 

 Prior to the 1946 passage of the FTCA, individuals could obtain compensation for negligent acts committed by federal employees through only a private bill in Congress. The FTCA was designed to replace that "notoriously clumsy" system.
 
 Dalehite v. United States
 
 ,
 
 346 U.S. 15
 
 , 25,
 
 73 S.Ct. 956
 
 ,
 
 97 L.Ed. 1427
 
 (1953).
 

 This label is somewhat imprecise because § 2680(h)"does not remove from the FTCA's waiver all intentional torts,
 
 e.g.
 
 , conversion and trespass, and it encompasses certain torts,
 
 e.g.
 
 , misrepresentation, that may arise out of negligent conduct."
 
 Levin v. United States
 
 ,
 
 568 U.S. 503
 
 , 507 n.1,
 
 133 S.Ct. 1224
 
 ,
 
 185 L.Ed.2d 343
 
 (2013).
 

 "Administrative searches" are an exception to the general rule that a search or seizure is unreasonable in the absence of individualized suspicion.
 
 See
 

 United States v. Hartwell
 
 ,
 
 436 F.3d 174
 
 , 178 (3d Cir. 2006). "Suspicionless checkpoint searches" are one such example, and "are permissible under the Fourth Amendment when a court finds a favorable balance between 'the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' "
 

 Id.
 

 at 178-79
 
 (quoting
 
 Illinois v. Lidster
 
 ,
 
 540 U.S. 419
 
 , 427,
 
 124 S.Ct. 885
 
 ,
 
 157 L.Ed.2d 843
 
 (2004) ). In
 
 Hartwell
 
 , we concluded that TSA screenings fall into this category and constitute permissible administrative searches.
 
 See
 

 id.
 
 at 181.
 

 See also
 

 United States v. Thornhill
 
 ,
 
 759 F.3d 299
 
 , 308 (3d Cir. 2014) ("In matters of statutory interpretation, the plain meaning of statutory language is often illuminated by considering not only the particular statutory language at issue, but also the structure of the section in which the key language is found, and the design of the statute as a whole and its object." (alterations omitted) (quoting
 
 United States v. Tupone
 
 ,
 
 442 F.3d 145
 
 , 151 (3d Cir. 2006) )).
 

 The dissent suggests that we render the remainder of the law enforcement proviso a nullity by interpreting "investigative or law enforcement officer" to refer to criminal law enforcement officers. To the contrary, our reading is the one that gives meaning to both components of Congress's definition of "investigative or law enforcement officer": a person who is designated an "officer" and who performs traditional criminal law enforcement functions. In any event, it is not unusual for Congress to define "law enforcement officer" by reference to the officer's duties, even if those duties all sound in criminal law.
 
 See, e.g.
 
 ,
 
 5 U.S.C. § 8331
 
 (20) ;
 
 12 U.S.C. § 248
 
 (q)(4) ;
 
 18 U.S.C. § 245
 
 (c) ;
 
 18 U.S.C. § 1515
 
 (a)(4).
 

 Our dissenting colleague contends there is no need to resort to canons of statutory construction because the text of the proviso is plain and unambiguous. Would it were so. Instead, our respective reasonable but divergent interpretations, as well as the split among the district courts that have considered the matter,
 
 see
 

 infra
 
 note 25, attest to its ambiguity. The dissent also posits specifically that the
 
 noscitur a sociis
 
 canon is inapplicable because the statute is phrased in the disjunctive, but even in that context, as the Supreme Court observed in
 
 Jarecki v. G.D. Searle & Co.
 
 , this canon is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."
 
 367 U.S. 303
 
 , 307,
 
 81 S.Ct. 1579
 
 ,
 
 6 L.Ed.2d 859
 
 (1961). There, considering the phrase "exploration, discovery, or prospecting," the Court concluded that because "[t]he three words in conjunction ... all describe income-producing activity in the oil and gas and mining industries," " 'discovery' ... means only the discovery of mineral resources."
 

 Id.
 

 at 305, 307
 
 ,
 
 81 S.Ct. 1579
 
 . And because those terms shared a "core of meaning," providing "a clue that it was those industries Congress had in mind when it drafted the provision," the Court found
 
 noscitur a sociis
 
 "illuminating."
 
 Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson
 
 ,
 
 559 U.S. 280
 
 , 289 n.7,
 
 130 S.Ct. 1396
 
 ,
 
 176 L.Ed.2d 225
 
 (2010) (discussing
 
 Jarecki
 
 ). Such is also the case here, where there is ambiguity as to whether those who conduct TSA screenings are "officer[s] ... empowered by law to execute searches,"
 
 28 U.S.C. § 2680
 
 (h), and where interpreting that phrase to include such administrative searches risks giving "unintended breadth" to the law enforcement proviso,
 
 Jarecki
 
 ,
 
 367 U.S. at 307
 
 ,
 
 81 S.Ct. 1579
 
 .
 

 In addition,
 
 50 U.S.C. §§ 1809
 
 and 1827 criminalize unauthorized engagement in or disclosure of information from electronic surveillance or physical searches under color of law, but carve out an affirmative defense where the defendant is "a law enforcement or investigative officer" who engaged in the surveillance in the course of his official duties and pursuant to a warrant or court order.
 
 50 U.S.C. §§ 1809
 
 (b), 1827(b).
 

 In the Title III context, the Office of Legal Counsel (OLC) has determined that the powers of an "investigative ... officer" are not coextensive with those of a "law enforcement officer" but that both terms carry criminal law connotations. To determine whether DOJ agents are "investigative or law enforcement officers" per
 
 18 U.S.C. § 2510
 
 (7), as required for them to access communications intercepted under the statute, the OLC noted that "the definition is phrased throughout in the disjunctive-investigative
 
 or
 
 law enforcement officer, empowered to conduct investigations
 
 or
 
 to make arrests."
 
 14 Op. O.L.C. 107
 
 , 108 (1990). Based on this disjunctive, the OLC reasoned that "it seems plain that Congress intended the term 'investigative officers' to be broad enough to include officials who participate in investigations but do not have arrest authority."
 

 Id.
 

 In the same breath, however, the OLC emphasized the criminal law enforcement functions of the investigative officers in question, stating that "the only discussion in the legislative history of the term 'investigative officers' indicates that the term encompasses
 
 all officers
 
 who carry out
 
 any law enforcement duties relating to offenses
 
 enumerated in [18 U.S.C. §] 2516."
 

 Id.
 

 (emphasis added).
 

 While we acknowledge, of course, that these words do not necessarily hold the same meaning across statutes, the regularity with which these words are used in the criminal law context does bear on their meaning here.
 

 See also
 

 21 U.S.C. § 880
 
 (authorizing entry of premises and inspection of finished and unfinished drugs, chemicals, and other substances and materials); 42 U.S.C. § 263b(g) (authorizing entry and inspection of mammography facilities);
 
 42 U.S.C. § 5413
 
 (authorizing entry and inspection of factories and warehouses where manufactured homes are manufactured, stored, or held for sale);
 
 42 U.S.C. § 7414
 
 (a)(2) (authorizing entry and inspection of premises of any person who owns or operates an emission source).
 

 H.R. 10439 Hearings
 
 at 14 (statement of Jaffe);
 
 see also
 
 119 Cong. Rec. 33,496 (1973) (giving verbatim explanation in reference to S. 2558).
 

 An almost identical, subsequently enacted provision permits the Treasury Secretary to settle claims for damage or loss caused by "an investigative or law enforcement officer ... who is employed by the Customs Service and acting within the scope of his or her employment."
 
 19 U.S.C. § 1630
 
 .
 

 The dissent discounts the corroborative value of § 3724 's legislative history because it reflects that personnel such as "a DEA Agent, ... a Border Patrolman, or a Deputy Marshal" who also perform administrative searches are not insulated from the proviso's scope. Dissent at 228-29 (quoting H.R. Rep. No. 101-46, at 7 ). However, the fact that traditional criminal law enforcement officers may
 
 also
 
 have occasion to perform administrative searches does not alter the fact that they are empowered to conduct criminal law enforcement functions and in no way casts doubt on the textual and historical reasons to believe that § 2680(h) and § 3724 exclude from their reach those who perform
 
 only
 
 administrative searches.
 

 In
 
 Millbrook v. United States
 
 ,
 
 569 U.S. 50
 
 ,
 
 133 S.Ct. 1441
 
 ,
 
 185 L.Ed.2d 531
 
 (2013), the Supreme Court abrogated
 
 Pooler
 
 , holding that the torts covered by the proviso were not restricted to those committed during the course of a search, seizure, or arrest.
 

 Id.
 

 at 57
 
 ,
 
 133 S.Ct. 1441
 
 . The Government there conceded that the named federal officers constituted "investigative or law enforcement officers,"
 

 id.
 

 at 55 n.3,
 
 133 S.Ct. 1441
 
 , so the question before the Court was
 
 when
 
 a tort committed by such an officer would fall within the proviso and the Court did not have occasion to address
 
 who
 
 meets the definition of an "investigative or law enforcement officer,"
 
 see
 
 id.
 

 Millbrook
 
 thus does nothing to disturb our conclusion in
 
 Matsko
 
 that employees of administrative agencies do not meet that definition.
 

 As discussed in more detail below, in
 
 Vanderklok
 
 , we reiterated this distinction, relying on the ATSA's separate designation of "employees" and "law enforcement officers" to conclude that "TSA employees typically are not law enforcement officers and do not act as such."
 
 868 F.3d at 208
 
 . Although we were assessing there only whether TSOs were law enforcement officers for purposes of
 
 Bivens
 
 claims, we expressly recognized the cabined authority of TSOs, in contrast with the more expansive powers of law enforcement officers.
 
 See
 

 id.
 

 at 208-09
 
 .
 

 While INS agents have some civil responsibilities, they are also empowered "to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens."
 
 8 U.S.C. § 1357
 
 (a)(4) ;
 
 cf.
 

 Sessions v. Dimaya
 
 , --- U.S. ----,
 
 138 S.Ct. 1204
 
 , 1212-13,
 
 200 L.Ed.2d 549
 
 (2018) (plurality opinion) (explaining that removal proceedings in some ways resemble criminal actions);
 
 Mateo v. Att'y Gen.
 
 ,
 
 870 F.3d 228
 
 , 232 (3d Cir. 2017) (same). Likewise, Bureau of Prisons officers are entitled to carry firearms and make arrests for violations of federal law,
 
 see
 

 18 U.S.C. § 3050
 
 , as are customs officers,
 
 see
 
 19 U.S.C. § 1589a.
 

 Sami v. United States
 
 ,
 
 617 F.2d 755
 
 (D.C. Cir. 1979),
 
 abrogated on other grounds by
 

 Sosa
 
 ,
 
 542 U.S. 692
 
 ,
 
 124 S.Ct. 2739
 
 , is not to the contrary. In that case, the D.C. Circuit was asked to determine whether the Chief of the United States National Central Bureau was covered by the law enforcement proviso notwithstanding the fact that his "present duties d[id] not involve frontline law enforcement work."
 

 Id.
 

 at 764
 
 . He was, the court concluded, because his position was unquestionably that of a
 
 criminal
 
 law enforcement officer: He was classified as a "criminal investigator[ ]" and the Government had stipulated that he served in a position that could be staffed by only "trained law enforcement personnel."
 

 Id.
 

 See
 

 Corbett v. Transp. Sec. Admin.
 
 ,
 
 568 F. App'x 690
 
 , 701 (11th Cir. 2014) (per curiam) (holding that the law enforcement proviso does not cover TSA screeners). Pursuant to 11th Cir. R. 36-2, unpublished opinions of the Eleventh Circuit "may be cited as persuasive authority."
 

 Compare, e.g.
 
 ,
 
 Hernandez
 
 ,
 
 34 F.Supp.3d at 1182
 
 (holding that the proviso does not cover TSA screeners),
 
 Weinraub v. United States
 
 ,
 
 927 F.Supp.2d 258
 
 , 266 (E.D.N.C. 2012) (same),
 
 and
 

 Coulter v. U.S. Dep't of Homeland Sec.
 
 , No. 07-4894,
 
 2008 WL 4416454
 
 , at *9 (D.N.J. Sept. 24, 2008) (same),
 
 with
 

 Armato v. Doe 1
 
 , No. CV-11-02462-PHX-ROS,
 
 2012 WL 13027047
 
 , at *4 (D. Ariz. May 15, 2012) (holding that the proviso covers TSA screeners).
 

 We recognize that
 
 5 U.S.C. § 2105
 
 defines "employee" to cover both an "officer" and an individual who has been appointed to civil service in a certain specified manner. However, to be an "officer," the individual must be "required by law to be appointed in the civil service by ... the head of an Executive agency."
 

 Id.
 

 § 2104(a)(1). As the parties agreed at oral argument, TSA screeners are not appointed by the head of an executive agency and are therefore not "officers" under Title 5's definition.
 
 See
 
 Corrected Tr. of Oral Arg. at 23:3-4. While the dissent correctly points out that § 2104 is underinclusive in that a few categories of "investigative or law enforcement officers" traditionally covered by the proviso are not appointed by the head of an executive agency, we cannot agree that we should therefore disregard the statutory definition of "officer" or the distinction Congress has drawn between "officers" and "employees." We hew more closely to Congress's intention by acknowledging its definition and including a small number of additional traditional criminal law enforcement officers within the proviso than by setting that definition aside entirely.
 

 Although § 114(p) is phrased in the conjunctive while the proviso is phrased in the disjunctive, § 114(p) remains instructive in determining who constitutes a "law enforcement officer" under the proviso because it reflects Congress's own distinction between TSA screeners and "law enforcement officer[s]" in Title 49, which tracks its distinction between "employees" and "officers" in the FTCA.
 

 Other analogous statutes, such as that governing Postal Inspectors, likewise preserve the text-based distinction between regular employees and officers by separately denominating the law enforcement arm of the agency.
 
 See, e.g.
 
 ,
 
 18 U.S.C. § 3061
 
 (a) (discussing "Postal Inspectors and other agents of the United States Postal Service designated by the Board of Governors to investigate criminal matters"). We note too that Congress has expressly provided that certain employees qualify as "investigative or law enforcement officers" where their classification as such might otherwise be uncertain, such as personnel designated by the Secretary of the Interior and the Secretary of Commerce to enforce federal laws relating to fish and wildlife, who qualify as "investigative or law enforcement officers" for FTCA purposes under the express terms of their authorizing statute.
 
 See
 
 16 U.S.C. § 742
 
 l
 
 (b). Congress made no such provision in the ATSA for TSA screeners.
 

 Screening Hearing
 
 at 7 (statement of Edmund "Kip" Hawley, Assistant Secretary, Transportation Security Administration);
 
 see
 
 Press Release, Transp. Sec. Admin.,
 
 Transportation Security Officers Have Renewed Focus and New Look on Seventh Anniversary of 9/11
 
 (Sept. 11, 2008), https://www.tsa.gov/news/releases/2008/09/11/transportationsecurity-officers-have-renewed-focus-and-new-look-seventh.
 

 Moreover, most of the prohibited items for which TSOs search are perfectly legal to possess in other contexts.
 
 See What Can I Bring?
 
 , Transp. Sec. Admin., https://www.tsa.gov/travel/security-screening/whatcanibring/all (last visited July 6, 2018). Thus, if an individual is found with a prohibited item, the TSA can impose only civil penalties: "Criminal penalties and fines are different and wholly separate from the civil penalties assessed by TSA," and "[r]eferral for criminal investigation and enforcement is appropriate where there appears to be a violation of criminal laws."
 
 Enforcement Sanction Guidance Policy
 
 , Transp. Sec. Admin., https://www.tsa.gov/sites/default/files/enforcement_sanction_guidance_policy.pdf (last visited July 6, 2018);
 
 see also
 

 49 C.F.R. § 1503.401
 
 .
 

 Even the dissent seems to acknowledge as much when it posits that " 'search' in § 2680(h) is synonymous with the term 'search' as used in the Fourth Amendment," Dissent at 239, and derives from general dictionary definitions that "any officer of the United States" must mean anyone "charged with administering and maintaining the law" or "appointed or elected to serve in a position of trust, authority, or command," Dissent at 243-44 (quoting
 
 Officer
 
 , Webster's Third New International Dictionary (1971)).
 

 Typically, we construe a waiver of sovereign immunity strictly and "in favor of the sovereign."
 
 Lightfoot v. United States
 
 ,
 
 564 F.3d 625
 
 , 628 (3d Cir. 2009). We are mindful that the Supreme Court has directed courts not to apply this general rule in interpreting exceptions to the waiver of immunity.
 
 See, e.g.
 
 ,
 
 Dolan
 
 ,
 
 546 U.S. at 492
 
 ,
 
 126 S.Ct. 1252
 
 . Here, however, we are dealing with an exception to an exception, which arguably supports reverting to the general rule of strict construction.
 
 See
 

 Foster v. United States
 
 ,
 
 522 F.3d 1071
 
 , 1079 (9th Cir. 2008) (applying this analysis). To the extent
 
 Dolan
 
 does apply to an exception to an exception, it directs us "to identify 'those circumstances which are within the words and reason of the exception'-no less and no more."
 
 546 U.S. at 492
 
 ,
 
 126 S.Ct. 1252
 
 (quoting
 
 Kosak v. United States
 
 ,
 
 465 U.S. 848
 
 , 853 n.9,
 
 104 S.Ct. 1519
 
 ,
 
 79 L.Ed.2d 860
 
 (1984) ). It does not, as the dissent asserts, suggest that the language should be interpreted against the Government. In any event, we need not and do not here decide whether to construe the language in favor of the Government; we merely flag this issue as a reminder of the significant interests involved when the federal treasury is at stake.
 

 Counsel for the Government asserted at oral argument that the United States could, in appropriate cases, refuse to insulate a TSO from liability by declining to certify under the Westfall Act that the TSO was acting within the scope of her employment.
 
 See
 
 Corrected Tr. of Oral Arg. at 30:6-12;
 
 see also
 

 28 U.S.C. § 2679
 
 (d)(1), (2) ;
 
 Osborn v. Haley
 
 ,
 
 549 U.S. 225
 
 , 229-30,
 
 127 S.Ct. 881
 
 ,
 
 166 L.Ed.2d 819
 
 (2007).
 

 These factual scenarios are as follows: "(1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative."
 
 Toney
 
 ,
 
 961 A.2d at 197-98
 
 .
 

 We do not address the second issue that we asked Amicus to brief-whether the FTCA's judgment bar precludes these
 
 Bivens
 
 claims-because the parties agree that it has since been resolved by the Supreme Court, which has ruled that the bar does not apply in these circumstances.
 
 See
 

 Simmons v. Himmelreich
 
 , --- U.S. ----,
 
 136 S.Ct. 1843
 
 , 1847-48,
 
 195 L.Ed.2d 106
 
 (2016).
 

 This also disposes of Pellegrino's
 
 Bivens
 
 conspiracy and aiding-and-abetting claims.
 
 See
 

 Black v. Montgomery County
 
 ,
 
 835 F.3d 358
 
 , 372 n.14 (3d Cir. 2016) ("Because the District Court reasoned that [the appellant] could not succeed on her underlying Fourth Amendment malicious prosecution or Fourteenth Amendment due process claims, it correctly determined that she could not succeed on her conspiracy claims.").
 

 Pellegrino requested copies of "all records, reports, follow-up requests, etc., from any TSA office containing her name, Nadine Pellegrino Waldman[,] that was initiated by any TSA officer, official, investigator, or personnel." Gary Decl. ¶ 4, D.Ct. Dkt. No. 232;
 
 see
 

 5 U.S.C. § 552
 
 (a)(3)(A).
 

 To the extent that Pellegrino challenges the District Court's disposition of her claims under
 
 42 U.S.C. § 1985
 
 (3), the APA, or the Privacy Act, we have reviewed the District Court's analysis and discern no error.